In re SANTA CLARA CIRCUITS WEST, INC., a Utah corporation, Debtor.

Bankruptcy No. 82M–02022.

United States Bankruptcy Court, D. Utah.

Dec. 10, 1982.

Thomas E. Lowe, Swaner & Taylor, Salt Lake City, Utah, for debtor.

Patricia S. Drawe, Salt Lake City, Utah, for Mountain Fuel Supply Co.

## MEMORANDUM DECISION

GLEN E. CLARK, Bankruptcy Judge.

This case requires the Court to determine whether a utility may demand a cash deposit of a debtor when the pre-petition default in the debtor's account is *de minimus* and to decide what conditions will provide the utility in this case with adequate assurance of payment.

### FACTUAL AND PROCEDURAL BACKGROUND

Santa Clara Circuits West, Inc., (debtor), a manufacturer and seller of electronic circuit boards, filed a Chapter 11 petition on

August 13, 1982. Mountain Fuel Supply Company (Mountain Fuel) is a utility which supplies natural gas to debtor's plant.

By letter dated September 3, 1982, Mountain Fuel's business office representative notified debtor that as of the date of debtor's filing, Mountain Fuel would open a new account for debtor. The letter went on to state that:

Because of this filing, it is our policy to request new Gas Service Agreements and security deposits on each account. ˙ Please be advised that we base our deposits on an estimated 90 day's billing. The amount required is as follows:

| | |
|---|---|
| 2034 W. 23rd S. | $ 600.00 |
| 2036 W. 23rd S. | $ 850.00 |
| Total | $1,450.00 |

Enclosed you will find Gas Service Agreement cards. Please fill in the spaces indicated by the "x," sign, notarize, and return them with your check in the postage-paid envelope that is provided.

The receipt of these items by September 17, 1982 will insure continuous gas service. Your prompt attention to this matter is appreciated. Should there be any questions, please call me at 534–5016.

On the date of debtor's filing, it owed Mountain Fuel $29.00.

On September 24, 1982, debtor filed a motion requesting the Court to rule that Mountain Fuel had no right to demand a security deposit or, in the alternative, to determine what security is necessary in this case to provide Mountain Fuel adequate assurance of payment. On October 4, Mountain Fuel filed its memorandum. On October 5, the Court held an evidentiary hearing on debtor's motion.

At the hearing, the parties submitted, by stipulation, copies of Mountain Fuel's records of debtor's gas usage and payments between January 23, 1981 and August 27, 1982. Exhibit 1. The parties also submitted, by stipulation, copies of two guarantees of payment of the debtor's accounts with Mountain Fuel. Exhibit 2. The debtor submitted a list of its monthly expenses. Exhibit 3.

Earl Patterson, an officer of the debtor, testified that the list of monthly expenses was accurate, that the debtor billed $30,000 in September for work completed, that debtor employs 20 to 25 persons, and that he is an officer of Pen-Tec Enterprises, Inc., the guarantor of debtor's accounts.

The debtor requested judicial notice of its post-petition financing arrangement under which it is to receive 80% of its accounts receivable in exchange for a priority lien in favor of the financing party.

The Court now files this memorandum decision on the issues raised by debtor's motion.

## PROPRIETY OF MOUNTAIN FUEL'S DEMAND FOR A DEPOSIT

Debtor argues that Mountain Fuel is not entitled to demand a security deposit, reasoning that Mountain Fuel's demand unlawfully discriminated against it because of its Chapter 11 filing. In debtor's view, a demand for a security deposit based solely on the fact of a Chapter 11 filing is prohibited by 11 U.S.C. § 525. The debtor argues that where a debtor owes at filing only a *de minimus* amount for services, "the protection provided by [Section] 366(b) is not available to a utility company." Debtor's memorandum, p. 5. Debtor also argues that in this case, Section 362(a) prohibited Mountain Fuel's demand.

Mountain Fuel contends that although it is authorized to do so, it did not request a security deposit solely because of debtor's filing. In Mountain Fuel's view, debtor's payment history shows "numerous missed and late payments," and "unpaid balances carried over almost every month in the past two years." Mountain Fuel's memorandum, p. 2, 4. For purposes of this discussion, however, the Court will assume that Mountain Fuel's demand was prompted exclusively by debtor's Chapter 11 filing.

*1. Demand for a security deposit and the automatic stay*

■ Debtor does not indicate which subsection of 11 U.S.C. § 362(a) it believes might prohibit a utility's demand for a se-

curity deposit. Mountain Fuel's deposit requirement is not designed to serve as a device for collecting a pre-petition debt. In fact, exhibit 1 shows that Mountain Fuel has written off debtor's pre-petition debt. Thus, subsections (1) and (6) of Section 362(a) are inapplicable. Subsection (3), however, prohibits "any act to obtain . . . property from the estate." A demand for a security deposit may be an act to obtain property from the estate.

Although Section 362(a)(3), by its terms, arguably prohibits a utility from seeking to obtain property from the estate by means of a security deposit, a utility's demand for security is specifically authorized by Section 366(b) as explained below. The Court must presume that Congress intended these two provisions to be consistent with one another and that, therefore, a demand for security authorized by Section 366(b) does not violate Section 362(a)(3). *See Morton v. Mancari,* 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974) ("The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.") The bankruptcy court for the Southern District of Ohio has reached a similar conclusion, holding that a utility's demand for security under Section 366(b) is not violative of the automatic stay of Section 362(a)(3). *Hennen v. Dayton Power & Light Co. (In re Hennen),* 17 B.R. 720 (Bkrtcy.S.D.Ohio 1982). None of the other subsections of Section 362(a) appear to apply in these circumstances.

*2. Section 366 and Mountain Fuel's demand for a security deposit*

Section 366 provides that:

(a) Except as provided in subsection (b) of this section, a utility may not alter, refuse, or discontinue service to, or discriminate against, the trustee or the debtor solely on the basis that a debt owed by the debtor to such utility for service rendered before the order for relief was not paid when due.

(b) Such utility may alter, refuse, or discontinue service if neither the trustee nor the debtor, within 20 days after the date of the order for relief, furnishes adequate assurance of payment, in the form of a deposit or other security, for service after such date. On request of a party in interest and after notice and a hearing, the court may order reasonable modification of the amount of the deposit or other security necessary to provide adequate assurance of payment.

Debtor relies on Collier's statement that "discrimination against the debtor or trustee is flatly precluded by subsection 366(a) and not mentioned in subsection 366(b) which suggests that discrimination against a debtor simply because it has sought relief under the Bankruptcy Act is improper." 2 Collier on Bankruptcy ¶ 366.03, at 366-4 (15th ed.1982). While it is true that Section 366(a) prohibits a utility from altering service to, refusing service to, discontinuing service to, or discriminating against the trustee or the debtor solely because a debt for pre-order-for-relief service was not paid when due, Section 366(a) is expressly made subject to Section 366(b).

■ Section 366(b) permits a utility to alter, refuse, or discontinue service if the debtor fails to furnish adequate assurance of payment for post-order-for-relief services. A judicial determination of what constitutes adequate assurance of payment is not made a prerequisite to alteration, refusal, or discontinuation of service. Thus, a utility may make an independent determination of what security is necessary to provide adequate assurance. It follows that a utility may notify the debtor of what it requires. If the debtor disagrees, it may ask the court to modify the utility's demand. *Accord, In re Robmac, Inc.,* 8 B.R. 1 (Bkrtcy.N.D.Ga.1979); *In re Hennen, supra; In re Stagecoach Enterprises,* 1 B.R. 732, 734 (Bkrtcy.M.D.Fla.1979). But if neither the debtor nor any other party in interest requests a hearing, the utility may alter, refuse, or discontinue service if in the utility's subjective judgment it has not been given adequate assurance of payment.

This Court disagrees with *In re Coury*, 22 B.R. 766 (Bkrtcy.W.D.Pa.1982). *See also Demp v. Philadelphia Electric Co. (In re Demp)*, 22 B.R. 331 (Bkrtcy.E.D.Pa.1982) (following *Coury*). In *Coury*, a utility demanded security deposits of debtors who were not delinquent in their payments at the time of filing their bankruptcy petitions. The court read Sections 366(a) and (b) to mean that a utility could demand security of a debtor only when there had been a pre-filing default:

> Section 366(b) can only be read in conjunction with Section 366(a). Section 366(a) states that a utility can only discriminate against a debtor who has defaulted prior to filing pursuant to Section 366(b); that is, by demanding security. The utility cannot read Section 366(b) as giving rights to security if there has been no default.

22 B.R. at 767. This reading inverts Sections 366(a) and 366(b). Section 366(a) is not a limitation on Section 366(b). Instead, Section 366(b) is an exception to the prohibitions of Section 366(a). If *Coury* were correct, a utility could not alter, refuse, or discontinue service to a debtor in cases where the debtor was not in default on payments for services rendered before the order for relief even if the debtor failed to provide adequate assurance of payment for services provided after the order for relief. By its terms, however, Section 366(b) is effective without regard to the pre-order-for-relief status of the debtor's account.

For these reasons, Mountain Fuel's notice of its demand for security was given lawfully. It is therefore unnecessary to address the debtor's argument that Mountain Fuel unlawfully discriminated under Section 525. Even if Mountain Fuel were a governmental unit, acts permitted by Section 366 are not prohibited by Section 525.

## ADEQUATE ASSURANCE OF PAYMENT

■ Section 366(b) protects utilities "by requiring the debtor or trustee to provide . . . adequate assurance of payment for service provided after the date of the petition." H.R.Rep. No. 95–595, 95th Cong., 1st Sess., 350 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess., 60 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6306. Adequate assurance of payment for post-order-for-relief, not pre-order-for-relief, services is required. Moreover, the requirement is "adequate assurance," not "adequate protection."

The House Report on Section 366, *supra*, indicates that "if an estate is sufficiently liquid, the guarantee of an administrative expense priority may constitute adequate assurance of payment for future services. It will not be necessary to have a deposit in every case." Collier argues that since under Section 364(a), "an administrative priority will be available to the utility as a matter of course . . . something more [than an administrative claim] should be required [in order to provide adequate assurance of payment]." 2 Collier on Bankruptcy ¶ 366.-03, at 366–4 (15th ed.1982). Collier's exclusion of the guarantee of an administrative priority as one means of providing adequate assurance of payment is unjustified. Section 366(b) places no limits on methods for adequately assuring utilities of payment for post-order-for-relief services. Thus, the guarantee of an administrative priority may well adequately assure a utility in a given case. This conclusion follows from the House Report, which clearly indicates that in some cases the guarantee of an administrative priority may constitute adequate assurance.[1]

1. The House Report's statement that "if an estate is sufficiently liquid, the guarantee of an administrative expense priority may constitute adequate assurance of payment for future services," may be confusing because "if a debtor is truly liquid, it can put up a deposit and does not need to resort to the 'other security' alternative. Only the cash poor debtor will need an alternative to the deposit form of adequate as-surance." Hughes, " 'Waivering Between the Profit and the Loss': Operating a Business During Reorganization under Chapter 11 of the New Bankruptcy Code," 54 AM.BANKR.L.J. 45, at 83 n. 267 (1980). Thus, it has been proposed that "to give meaning to the 'other security' alternative, a judge should apply a very liberal standard when determining if a debtor is 'sufficiently liquid,' or reject the stan-

Aside from the question of administrative priority as adequate assurance of payment, the cases interpreting Section 366 have found that "adequate assurance of payment does not mean guaranty of payment; but the Court must find that the utility is not subject to an unreasonable risk of future loss." *In re George C. Frye Co., supra,* note 1, at 121 (quoting 2 Collier on Bankruptcy ¶ 366.03); *Massachusetts Electric Co. v. Keydata Corporation (In re Keydata Corp.),* 12 B.R. 156, 158 (Bkrtcy.App.Pan. 1st Cir. 1981). Moreover, the cases have held that "adequate assurance of payment" does not mean the deposit approved or required by a state regulatory commission. *In re Hennen, supra; In re Robmac, supra; In re Stagecoach Enterprises, supra; In re Coury, supra.*

■ What constitutes "adequate assurance of payment" is a fact question dependent on the circumstances of each case. The factors to be considered and the weight to be given them may vary from case to case.

In a Chapter 11 case, "adequate assurance of payment" must be interpreted consistently with the rehabilitative function of Chapter 11. "The requirement of payment . . . of [a] required deposit shortly upon the filing of a Chapter 11 petition may be in some situations . . . such a financial burden upon the debtor as to thwart or deter rehabilitation potential, and thereby be an unreasonable demand. The amount . . . should not be contrary to the rehabilitation

process . . . there may be other methods of providing adequate assurance of payment to the utility company which may not adversely affect rehabilitation." *In re Robmac, supra,* at 4.

■ In determining adequate assurance, the Court may consider the pre-petition security required of the debtor by the utility, the debtor's payment history, the debtor's present and future ability to pay its current expenses, the debtor's net worth, the debtor's cash requirements, the probability of payment through distribution under the bankruptcy laws, and, since some degree of risk is calculated as part of the rate charged for utility services, the degree by which the risks of nonpayment from the debtor exceed the risks of nonpayment from the utility's other customers.

A cash deposit may not be necessary if guarantees or other non-cash forms of security are available. Additional protection can be provided by relieving the utility from termination prerequisites imposed by law or by state regulatory bodies. The court may also, when appropriate, require the debtor to limit its use of utility service.

Based upon the evidence, the Court concludes that a cash deposit is a necessary element of adequate assurance of payment in this case. Over the past year and a half, the debtor was continually behind on its Mountain Fuel account. Although the unpaid balance was only $29.00 when the debt-

dard altogether." *Id.* Because a debtor's "liquidity" may have little to do with whether administrative claims will be paid as required by the Code, an examination into the debtor's "liquidity" may be a fruitless inquiry when administrative priority as adequate assurance is proposed.

One court has interpreted the House Report restrictively. Reasoning that the quoted language from the House Report is not found in the Senate Report, the court in *In re Stagecoach Enterprises, Inc.,* 1 B.R. 732, 734 (Bkrtcy. M.D.Fla.1979), concluded that "it is not generally appropriate to give administrative expense priority to debts incurred by the debtor for utility service furnished after the date of the order for relief as 'adequate assurance of payment' for those services. To do so would unwarrantedly prejudice the rights of general creditors." As noted above, however, placing

this limitation on adequate assurance of payment improperly restricts Section 366(b)'s broad terms.

In *In re George C. Frye Co.,* 7 B.R. 856, 7 B.C.D. 120 (Bkrtcy.D.Me.1980), a Chapter 11 debtor was cash poor but could promptly pay its current bills, including its phone bill. The debtor's unencumbered assets were in excess of $1,000,000. Recognizing that on confirmation of a plan, administrative claims must be paid in full absent agreement otherwise, the Court held that an administrative expense priority coupled with a procedure for payment of phone bills within 10 days after receipt constituted adequate assurance of payment. *Frye* illustrates why a liquidity test may be irrelevant. Even a cash poor debtor may be able to show that the guarantee of an administrative priority adequately assures a utility of payment for future services.

or filed its Chapter 11 petition in August, it ranged as high as $948.82 in March of this year.

The facts of this case do not show that Mountain Fuel's guarantee of an administrative expense priority is adequate assurance of payment. The debtor has obtained financing at the level of 80 percent of its accounts receivable. For September's work, it billed $30,000. The debtor's statement of monthly expenses claims expenses of only $13,975.00. This list of expenses, however, appears to be understated. Given Mr. Patterson's testimony that the debtor employs 20 to 25 persons, $5,000.00 per month for "payroll" seems low. Mountain Fuel's monthly bill is underestimated for winter months. Moreover, the statement includes nothing for current taxes. The debtor's schedules of assets and liabilities show secured debt of $797,203.24, unsecured debt of $216,211.26 and assets of only $208,-395.73. The debtor has produced no other evidence on the question of whether an administrative expense priority will adequately assure payment to Mountain Fuel in this case.

The debtor argues that it has provided "personal guarantees" which adequately assure Mountain Fuel of payment. But the guarantees are not personal guarantees. Instead, they are corporate guarantees of Pen-Tec Enterprises, Inc. The guarantees are signed by Earl Patterson, as President of Pen-Tec. Mr. Patterson is an officer of the debtor. Although Mountain Fuel's argument that its company policy is against accepting corporate guarantees has no force because the bankruptcy court may determine that a corporate guarantee constitutes adequate assurance, in this case the debtor failed to show that Pen-Tec's guarantee is reliable. The Court is therefore unable to conclude that the guarantee provides adequate assurance of payment.

Mountain Fuel argues that "there is a substantial inevitable time lag from the time of service to the reading of the gas meter to the billing process and to receipt of payment. A customer would ordinarily receive more than a full month's gas service before his delinquency for a prior month's service charges would become known." Mountain Fuel's memorandum, p. 3. Although it may be appropriate for the Court to condition adequate assurance upon a reduction of the time lag by the utility, there is no evidence in this case about the practicality of such an order. Mountain Fuel also argues that "inasmuch as gas usage is not level throughout the year, it is necessary to base a deposit on charges for high-use months to adequately assure payment during cold weather months." *Id.* At the hearing, Mountain Fuel also asserted that since last year, its rates have increased by 18 percent.

This Court disfavors, "criteria, one-two-three, which tend to impose *rigor mortis* into case law and application." *Virginia Electric and Power Co. v. Cunha (In re Cunha),* 1 B.R. 330 (Bkrtcy.E.D.Va.1979). On the other hand, standards more surely determinable than those discussed above may be helpful to debtors and utilities in their negotiations toward avoidance of the cost and delay of a judicial determination.

■ When a cash deposit is necessary and when the risk of nonpayment is substantial, the maximum cash deposit necessary to provide adequate assurance of payment will be an amount sufficient to cover the average billing period plus an amount sufficient to cover services between the end of the billing period and the due date of payment for that period. In this case, the maximum is necessary. In addition to the factors described above, the debtor has not filed its monthly financial reports. Given the weaknesses of the debtor's statement of monthly expenses, this failure looms large. The debtor has not shown that the risk that it will not pay Mountain Fuel's bills is sufficiently low to justify a smaller cash deposit.

■ The cash deposit in this case must be made by December 24, 1982. While payment of a cash deposit in monthly installments is proper in months of decreased usage, the next few months are those of highest usage and installment payments of the deposit will not adequately assure Mountain Fuel. The deposit will be calcu-

lated as follows. The three months in the past year in which debtor's use of natural gas was highest were December, January, and February. The average of the debtor's actual bills for those months is $471.07. Mountain Fuel indicated that its rates have gone up by 18 percent in the last year. Eighteen percent of $471.07 is $84.79; $471.01 plus $84.79 equals $555.86. Thus, the average monthly bill for the debtor's highest months of usage for this year, assuming that the weather this year is similar, will be approximately $555.00.

The parties have not shown how much time lapses between the end of Mountain Fuel's billing period and the due date of payment. Starting from $550.00 as a monthly figure, however, the amount necessary to cover payment for services during this period is calculable by the parties. This amount, when added to $550.00, will be the amount of the required deposit unless the debtor agrees to obligate itself to pay each invoice at an earlier date, thereby reducing the amount of the deposit to $550.00 plus an amount calculated by using the percentage derived from the quotient of the shorter period divided by 30 days.

Adequate assurance of payment in this case will also require that the debtor pay each invoice in cash or by cashier's check in full on or before the due date stated on the invoice or the earlier date to which the debtor may agree, as indicated above. Payment must be hand-delivered to Mountain Fuel at the location designated in its invoices on or before the due date or mailed sufficiently in advance of the due date that it will arrive on or before the due date.

Additionally, Mountain Fuel is permitted to terminate service to the debtor without complying with any other requirements on 48 hours notice to an officer of the debtor if any invoice is not paid in compliance with this decision.

Mountain Fuel shall submit an order consistent with this decision.