In re Jimmie Walter Lee HEARD, Jr. and Minnie D. Heard, Debtors.

Jimmie Walter Lee HEARD, Jr. and Minnie D. Heard, Plaintiffs,

v.

CITY WATER BOARD, Defendant.

Bankruptcy No. 5–86–02104.
Adv. No. 87–5012.

United States Bankruptcy Court,
W.D. Texas,
San Antonio Division.

Dec. 16, 1987.

considers it to be a case of considerable importance, although the dispute involves the seemingly trivial sum of $75.00. The sum is not trivial to the individual Debtors, for they are elderly retirees barely surviving on social security benefits, forced into bankruptcy because of massive medical bills.[1] The result is not trivial for the defendant, the City Water Board, for this opinion will affect thousands of future cases involving that entity.

## Findings of Fact

The facts are not disputed, and the following discussion is taken almost verbatim from the Plaintiffs' brief.

Jimmie Walter Lee Heard, Jr. and Minnie D. Heard filed their joint Chapter 7 bankruptcy petition on December 3, 1986. At that time, they owed the City Water Board $43.53 for water provided to their residence for the sewer taxes collected by the water utility on behalf of the City of San Antonio, Texas. The City Water Board is a government unit as defined by the Bankruptcy Code.

On December 4, 1986, the Heards paid $22.54 to the City Water Board. An additional $23.09 was paid on January 8, 1987. Both payments were intended by the Heards to be applied to their pre-petition bill, and the City Water Board applied the payments to the pre-petition bill; there was no intent by either party, with regard to these two payments, to circumvent or violate any bankruptcy law or policy.

On January 8, 1987, the water board mailed a "Contract for Water Service" to the Heards for their signature. The document stated in capital letters and red ink: "PLEASE SIGN AND RETURN TODAY WITH YOUR DEPOSIT OF $75.00—SERVICE WILL BE DISCONTINUED IN 20 DAYS IF DEPOSIT IS NOT RECEIVED IN OUR OFFICE."

The document is an application for residential water service, and is the same form

Lawrence Beck, San Antonio, Tex., for debtors.

Thomas Peterson, San Antonio, Tex., for San Antonio City Water Bd.

## MEMORANDUM OPINION

R. GLEN AYERS, Jr., Chief Judge.

### Introduction

This case has been pending under advisement for some time because this Court

---

**1.** The Debtors' attorney, Mr. Lawrence Beck, a prominent local bankruptcy attorney, has taken this case *pro bono* and should be commended in print.

that the water board mails to its customers who file bankruptcy and is also mailed to customers whose service is to be terminated for non-payment. The Water Board, in this case or any other, will terminate services unless the deposit is paid by the stated date. Following receipt of the notice, the Debtors sought the protection of this court.

Over a period stretching back a number of years, the Heards were always approximately 30 days behind in timely payment of their water bill, but Debtors' payment history shows regular and steady payments in full. Their account with the City Water Board was opened in 1968, and at no time prior to the petition, were they ever even threatened with the termination of the services provided them by the Water Board.

In October of 1986, prior to the petition, Mrs. Heard, on her own initiative had contacted the Water Board concerning her inability to bring the bill current. She was told that late payments were acceptable provided that she not fall more than 30 days in arrears. And, it would appear that it was the usual and ordinary practice of the City Water Board to allow a thirty day grace period to most residential customers who have difficulty paying bills promptly.

The City Water Board has an internal, written policy concerning continued service to customers who have filed bankruptcy petitions. Although the written policy was not available at the hearing, the credit manager summarized the policies and practices of the utility. The written policy was developed internally, *i.e.* by the staff of the Water Board without direct input by the board of trustees who are appointed by the San Antonio City Council to oversee the management of the utility, by the City Council, by the state Public Utilities Commission, or by the public at large. Except with regard to certain rate structures and other matters not relevant here, the general public policy in Texas is that both private and public utilities are self-regulated.

The Water Board policy treats residential customers who file bankruptcy or who simply fail to pay their bills as "new residential customers." Upon receipt of the bankruptcy filing notice, or upon termination of service for non-payment a new account is opened and the notice set forth above is sent. Like all "new" customers, consumer debtors are required to post a deposit in order to open a "new" account. The deposit is three times the average monthly bill for the type of residential service (determined by size of connection). The average is calculated on a city-wide basis. No exceptions are made for either debtors or other "new residential customers."

The City Water Board does not consider the financial circumstances of debtors or other "new" customers; it does not consider the amount due when bankruptcy is filed or when service is terminated for non-payment.

The deposit itself is quite reasonable given the billing procedure used by the Water Board. The City Water Board bills monthly for water delivered during the preceding 30 days. If a bill is rendered that includes charges for the current month and for the previous monthly billing cycle, a notice is included on the invoice that advises the customer to pay the total amount due to avoid discontinuance of service, service charges and an additional deposit. If a bill is rendered that includes the current charges and the charges for the preceding two monthly billing cycles, a final invoice together with a "contract for water service" as described above is sent to the customer, and the account is considered terminated. The actual exposure of the water board on any particular account is 110 days worth of service.

### Conclusions of Law

This is a consumer case. The controversy is when and how may a public utility require a debtor in a liquidation case to post a deposit at the commencement of the case to secure performance of post-petition payment. The answer requires not only construction of the statute itself, but also some reflection upon basic bankruptcy philosophy relating to the "fresh start".

There are three statutory provisions in the Code that deal with the Debtor's "fresh

start" as it relates to the controversy at hand. They are § 366 relating to utility deposits, § 524 which sets forth the effect of the discharge, and § 525 which prohibits discriminatory treatment based upon the granting of a discharge. The intent behind the adopting of these provisions was to codify existing law and policy, and on a case by case basis, to balance the competing interests of the utility and the debtor.

Philosophically, the substantive goals of the bankruptcy process are fair and equitable treatment of creditors among themselves (equality of distribution), and a fresh start for the individual debtor (removal of his existing financial burdens).

### Section 366

The starting point for any analysis of any debtor's relationship with any utility must be the specific provisions of the Bankruptcy Code dealing with that relationship:

§ 366. Utility service

(a) Except as provided in subsection (b) of this section, a utility may not alter, refuse, or discontinue service to, or discriminate against, the trustee or the debtor solely on the basis of the commencement of a case under this title or that a debt owed by the debtor to such utility for service rendered before the order for relief was not paid when due.

(b) Such utility may alter, refuse, or discontinue service if neither the trustee nor the debtor, within 20 days after the date of the order for relief, furnishes adequate assurance of payment, in the form of a deposit or other security, for service after such date. On request of a party in interest and after notice and a hearing, the court may order reasonable modification of the amount of the deposit or other security necessary to provide adequate assurance of payment.

■ The applicability of § 366 to cases under Chapter 11, 12 and 13 is clear and straightforward. However, in a Chapter 7 case, the section's application is less than clear. Section 366 seems, on its face, to be an alternative mechanism for adequate protection during the pendency of a bankruptcy case, and this is the focus of most opinions dealing with § 366. *See e.g. In re Santa Clara Circuits West, Inc.,* 27 B.R. 680, 681–84 (Bankr.D.Utah 1982). The few Chapter 7 cases dealing with the section ignore this apparent limitation. *See e.g., Lloyd v. Champaign Telephone Co.,* 52 B.R. 653 (Bankr.S.D.Ohio 1985).

However, a review of the legislative history does clearly show that the Congress intended the section to apply following discharge in Chapter 7 cases. *See* particularly S.Rep. No. 95–989, 95th Cong., 2d Sess., 60 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5846: "The utility may not alter, refuse or discontinue service because of the nonpayment of a bill that would be discharged in the bankruptcy case."

Since the section clearly applies, the remaining question is whether the demand made is discriminatory, for § 366 prohibits discrimination.

■ To begin, it is clear that § 366(b) actually permits utilities to discriminate, to a limited extent, as to debtors. The theory seems to be that utilities are almost required to deal with debtors post-petition. Unlike other creditors, they cannot simply refuse to deal, and thus avoid future risk.

This permissive discrimination may conflict, however, with the provisions of § 525, for the City Water Board is both a utility and a government unit:

§ 525. Protection against discriminatory treatment

[A] governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act, or another person with whom such a bankrupt or debtor has been associated, solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, has been insolvent before the com-

mencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act.

The provisions of § 525 are designed to protect the effect of the discharge. *See,* 11 U.S.C. § 524. The legislative history makes this very clear. As early as 1973, the Brookings Institution Report on the proposed revision of the bankruptcy laws stated:

> The "fresh start" policy of the present Act has been frustrated, in some instances, by provisions of federal and state laws that subject an individual who obtains a discharge, and fails to pay the discharged debt, to discriminatory treatment. This is but another example of the erosion of the "fresh start" that has been countenanced in the past. The Commission is of the opinion that such discriminatory treatment frustrates a major policy of the Bankruptcy Act and should be prohibited. Therefore, the commission recommends that no one be subjected to discriminatory treatment because he ... is or has been a debtor or has failed to pay a debt discharged in a case under the Act.

Report on the Bankruptcy Laws of the United States (Brookings Report), H.R.Doc. No. 93–137, 93rd Cong., 1st Sess., Pt. I (1973) at p. 177.

The congressional commentary on § 525 reflects this theme. Still, § 366(b) does allow a deposit or other mechanism to secure adequate assurance of future performance. Here, the legislative history and case law are clear.

> Section 366(b) protects utilities "by requiring the debtor or trustee to provide ... adequate assurance of payment for service provided after the date of the petition." H.R.Rep. No. 95–595, 95th Cong. 1st Sess., 350 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 60 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6306. Adequate assurance of payment for post-order-for-relief, not pre-order-for-relief, services is required. More-

over, the requirement is "adequate assurance," not "adequate protection."

*In re Santa Clara Circuits West, Inc.,* 27 B.R. at 684.

This deposit mechanism does, then, permit some form of discrimination based upon the failure to pay pre-petition utility bills, even where the utility is a government unit. *See, id.* at 684.

The deposit requirement may also be contrasted with the type of discrimination § 525 was intended to prohibit. Section 525 derives from *Perez v. Campbell,* 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971), which struck an Arizona statute denying a driver's license to anyone who failed to pay claims arising from an automobile accident.

The legislative history reflects concern with situations in which debtors are coerced, post-petition into the payment of otherwise dischargeable debt.

> The enumeration of various forms of discrimination against former bankrupts is not intended to permit other forms of discrimination. The courts have been developing the *Perez* rule. The section permits further development to prohibit actions by ... other organizations that can seriously affect the debtor's livelihood or fresh start, such as exclusion from a union on the basis of discharge of a debt to the union's credit union.

> The effect of the section, and of further interpretations of the *Perez* rule, is to strengthen the anti-reaffirmation policy found in Section 524(b). Discriminations based solely on nonpayment could encourage reaffirmations, contrary to the expressed policy.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 367 (1977), U.S.Code Cong. & Admin.News 1978, p. 6323.

■ The *Perez*—§ 525 analysis, however, still does not reveal prohibited discrimination or interference with the "fresh start." Unlike the *Perez* line of cases, the Debtors are not being required to pay pre-petition claims nor are they being denied a right or privilege because of non-payment of debt. All that the utility/governmental

entity seeks is protection from future, post-petition default.

Further, these Debtors are being treated like all other debtors and all other new customers. They are merely being requested to post a refundable deposit. The deposit protects the Water Board, which is acting as a lender. The lender's decision to extend or not extend credit can, apparently, be based on the fact of bankruptcy if bankrupts are not treated differently than any other persons failing to repay, even where the lender is a governmental unit. *See Goldrich v. New York Higher Education Services*, 771 F.2d 28 (2d Cir.1985).

In this case, the utility's demand for adequate assurance is misplaced, for even though § 366 or § 525 permit discrimination, § 366 limits the "discrimination" to the facts of each case. Except for the discharge of a month's service, the utility has never, in over 14 years, had any difficulty with these Debtors. Quite simply put, the utility needs no adequate assurance. Thus, while the *demand* was proper and non-discriminating, the Court finds that the requested deposit is not necessary.

▮▮▮ For the future guidance to a similarly situated utilities, the Court will summarize this opinion as follows:

1. In all bankruptcy proceedings, § 366(b) allows the utility to make a demand for adequate assurance.

2. It is not discriminatory under § 366(b) or § 525 to make such a demand on all debtors, so long as debtors are treated like all others who fail to repay the utility or like all new customers;

3. Where the debtor responds under § 366(b) with an objection to the demand, the court will then consider the reasonableness of the demand under the standards set forth in § 366(b).

4. Section 525(a) does not apply directly to utilities which are also governmental units since § 366(a) controls this issue where a utility is involved.

An order consistent with this opinion shall be entered on even date.